**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI SOUTHERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Criminal Action |
| | ) | No. 06-03036-01-CR-S-ODS |
| MICHAEL ADKINS, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

Pursuant to 28 U.S.C. § 636(b), the above-styled criminal action was referred to the undersigned for preliminary review. This matter comes before the Court on defendant's Motion to Suppress, to which the government has responded.

Defendant asserts that any evidence in this case and any statements he made should be suppressed. A hearing was held before the undersigned on July 18, 2008. A supplemental hearing was held on August13, 2008. Defendant was represented by counsel, Stuart Huffman, and the government was represented by Assistant United States Attorney James J. Kelleher. Specifically, defendant challenges a search warrant for his residence, dated September 10, 2005; a search warrant for his residence, dated November 16, 2005; a consensual search of his residence on December 22, 2005; and an interview that took place on January 24, 2006, where he denies making the statements attributed to him. Regarding the first search warrant, defendant contends that it was invalid because it contained information gleaned from an illegal search conducted under the guise of a protective sweep of his residence; and that the officers forced entry into his home based on information that

he was holding several individuals at gunpoint. Regarding the second search warrant, he contends that it was issued without probable cause, and that the information provided by Ms. Parker was stale. Defendant also challenges the December 22, 2005, consensual search of his residence on the basis that his girlfriend, who gave consent, was not a resident of his home, and could not validly consent to the search. Finally, defendant contends that when he was arrested on January 24, 2006, he either did not make the statements attributed to him, or he was suffering from diabetes and did not voluntarily and intelligently waive his Miranda rights.

At the first hearing, the government called Jim Stanley, a former detective with the Greene County Sheriff's Department and a TASK force officer with the Department of Arms, Tobacco, and Firearms ["ATF"]. On September 9, 2005, Officer Stanley received information about and went to defendant's residence in regard to a domestic assault. He was told that defendant had been arrested after a stand-off with deputies, and that there were people being held against their will in the house. By the time he arrived at the residence, the stand-off situation had been resolved. Officer Stanley proceeded to question some of the alleged victims. Anthony Bowles stated that he lived in the basement, and that there were numerous weapons there. He stated that one definitely belonged to defendant. Mr. Bowles gave the officers permission to go into the basement. Officer Stanley believed Mr. Bowles had authority to give his consent because some of his personal belongings were down there, as well as his television, and some of his guns. The officer believed that Mr. Bowles exercised physical control over the area.

Several deputies, who had arrived prior to Officer Stanley, conducted a protective safety sweep of the residence. He was not present. He was told there were guns in the residence, including in the bedroom. During the sweep, the deputies also saw evidence of small amounts of

methamphetamine and drug paraphernalia. Everything was in plain view. Based on this information and his interviews with witnesses at the residence, he contacted Detective Mark Hall, and apprised him of the information. Detective Hall then prepared and affidavit and applied for a search warrant. Officer Stanley stated that he had reviewed the search warrant before the hearing, and it was accurate. After the search warrant was issued, he assisted in executing it on September 10, 2005. Among items found during the search were ammunition in the bedroom, firearms from the basement, as well as a small amount of methamphetamine, and drug paraphernalia.

On cross examination, the witness acknowledged that he was not involved in the initial encounter that brought the officers to the scene. He does not know if the witness/victim was telling the truth because he didn't interview her. The officer did not investigate the veracity of any of the witnesses. He admitted that there were "No Trespassing" signs posted. He was told that defendant was taunting the officers with a spot light, and that he was therefore apprehended with a taser gun, and taken into custody. He agreed that defendant was not cooperative. He was not told when he arrived that defendant was displaying a firearm or that he had threatened anyone. Once defendant was arrested, no guns were found on his person or around him. Regarding Mr. Bowles' conversation, he stated that three of the guns in the basement were his, and one was defendant's. The three guns that belonged to him were in the area of his immediate control, and the other gun was in an separate area. Mr. Bowles never indicated he was being held against his will, nor did the other person downstairs. None of the children said they were being forcibly held. Mr. Bowles said he was scared of defendant, but he didn't indicate that he attempted to leave or that defendant told him he couldn't leave.

Regarding a protective safety sweep, Officer Stanley testified that officers basically look

for other people in the residence, but will note things that are in plain view. In this case, the officer wasn't there at the sweep, so he has no knowledge if the items were in plain view. Photographs were taken at the scene of items that were seen in plain view, after the search warrant had been signed. The officer denied that he ever threatened to take anyone's children if they didn't cooperate, like Mr. Bowles. He didn't know that defendant was a diabetic, who required insulin.

On redirect, Officer Stanley testified that the officers who conducted the safety sweep indicated that the items photographed were in plain view, and in the same condition as when they were first seen by the officers who swept the premises.

The next witness called by the government was Captain Randall Gibson, of the Greene County Sheriff's Department. On December 22, 2005, he received information that Kristin Parker, defendant's girl friend, had possibly been assaulted and kidnaped by defendant. He had prior experience with Ms. Parker involving altercations with defendant. These encounters had occurred at 3002 North Quail Lane, which is defendant's address. He knew that she was defendant's girl friend, and he believed that she lived with him. On this occasion, he met with her at that address, which he believed to be their shared residence. He took photographs of her on this date, which substantiated that she had received injuries consistent with her account of an assault. The officer testified that she stated she had been held against her will for a number of days at the North Quail residence, and was subjected to numerous assaults by defendant, including being hit by a sword and a knife, among other things. He asked Ms. Parker for consent to search the residence for those items of evidence, and she gave her written consent to search the premises. Among other items, they found a makeup bag with blood smeared on it. They also found a knife in the exact location Ms. Parker had described, and located several rounds of ammunition in a bedroom shared by defendant

and Ms. Parker.

On cross examination, the officer admitted that he suspected that Ms. Parker was a methamphetamine addict. He stated that on this occasion, he contacted her at a different address in Ash Grove. She indicated that defendant had been at their address the day before. He didn't remember finding any mail specifically addressed to Ms. Parker at the North Quail address, but he believed they found mail addressed to her at a post office box. He did not know that defendant was on bond for the previous incident, and that Ms. Parker was not supposed to be at the property. Regarding whether Ms. Parker was telling the truth, he had no reason to disbelieve her account, based on his prior knowledge and personal experience with defendant. On previous occasions, involving altercations between the two, he had contacted her at the North Quail address, so he had no reason to believe that she did not live there. When she signed the consent form, she indicated that it was her residence. From his previous contacts with her, the only place he had ever seen her was at the hospital emergency room or at the North Quail address. There had been so many times that the police had been there, and he had no information that she no longer lived there. At the time of the consent search, defendant was not present. When he went up to the house, there was a gate. It was usually closed, but he doesn't remember if it was closed that day. He had seen "No Trespassing" signs on the property on prior occasions. It was his conclusion that Ms. Parker lived at that address. At the time he contacted her, she indicated that she was back out at the residence because defendant took her there against her will. She said she had escaped earlier that morning from the North Quail address, that she had crawled across a pasture, and that defendant was asleep in a chair at the time she escaped.

The government next called Officer Dan Fridley of ATF to the witness stand. On January

24, 2006, he picked defendant up from the Nevada Police Department, and transported him back to Greene County. He read defendant his Miranda rights, and he acknowledged that he understood them. He indicated his willingness to speak to the officer. Officer Fridley asked defendant about the firearm he had when he was arrested in Nevada. He told the officer whom he had purchased it from, and indicated that he also purchased two others. He also admitted that he was aware of some firearms that had been recovered from his residence on September 9, 2005. He indicted that he believed his fingerprints would be found on a rifle he'd hidden at this residence. During the one-and a -half- hour drive, defendant answered cogently. He did not appear to be intoxicated, impaired, or ill, and was able to comment on events that had taken place two months prior, as well as the recent event. The officer saw nothing to indicate that defendant was incapacitated in any way.

On cross examination, Officer Fridley testified that he personally did not know where the gun was found when defendant was arrested in Nevada, but he did ask him where the firearm that was found on him was purchased, and he responded to that question. In the vehicle, defendant was in the front seat. He read him his rights directly from his Miranda card, but there was no signed form. Officer Fridley admitted that there might have been some talk in the past about defendant's lack of cooperation with law enforcement, but he did not ask him why he was being cooperative on that day. He did not know he was a diabetic. Once at the jail, defendant became a little more uncooperative during the booking process. The officer did not recall any complaints by defendant that he was dizzy, or feeling close to passing out, during the time the officer was with him while he was being booked. That was about twenty minutes.

Defendant called Tracy Glenn to the witness stand. In January of 2006, she was employed as an LPN at the Greene County Jail. Her job duties included, among other things, intake of

inmates. She doesn't recall being on duty when defendant was booked into the jail. She reviewed sick call requests from January 24, 2006, and testified that the jail does medical intake reports. If a positive intake, they try to see the inmate within 24 hours. She saw defendant on intake, and he was combative, yelling, and screaming. When she first had contact with him, she did not remember if he exhibited physical or mental problems, but she did find out that he had diabetes. She had four sick call reports for defendant, for blood sugar readings, which were all considered high. When someone's blood sugar is that high, they need insulin. She contacted a doctor after the first reading and got insulin orders. Regarding defendant's condition, she doesn't recall how he acted, and stated that everyone reacts differently to high blood sugar. Generally, symptoms a person might exhibit vary from being confused to the stage of a coma. It is not always obvious that someone is having a blood sugar issue. Not everyone would exhibit symptoms of confusion.

On cross examination, Ms. Glen reiterated that high blood sugar can cause extreme symptoms or no symptoms at all. Nothing about defendant's condition that day stands out in her mind. She did not recall if she was there at the time that defendant was first brought in.

At the supplemental hearing, held on August 13, 2008, the government called Lieutenant David Johnson of the Greene County Sheriff's Department. He was working on September 9, 2005, and received a call regarding a domestic assault on a female at defendant's residence. When he arrived, he was told that the victim had made a report to the officers that the live-in boyfriend was still inside the residence, and was holding some other people against their will. He and other officers surrounded the house and attempted contact by a bullhorn. Defendant came out on the porch with a bright spotlight, which he was shining while he taunted the officers. He refused to surrender, and was eventually subdued by a taser gun. The officers then went into the house to clear

it of victims and/or suspects. They found an adult male and several children. Officer Johnson made contact with a male, and in doing so, he saw syringes lying on the floor in the downstairs area. The male also pointed out a location where a weapon might be hidden, although the officer was not able to see it. Officer Johnson conveyed this information to Detective Stanley and other officers who were on the scene. To his knowledge a search warrant was obtained based on his information and that gathered from other officers who made entry into the residence.

On cross examination, the officer testified that he did not notice a "No Trespassing" sign when he came up to the house. He agreed that no one had an arrest or search warrant when they arrived at the residence. He testified that the officers kicked the door in when they entered the residence, after defendant had been subdued. It was Officer Johnson's testimony that the firearm that was pointed out in the basement was not in plain view. The male also stated that he was in fear of his life. He agreed that defendant indicated multiple times that the police were not welcome on his property and requested that they leave.

The government also called Corporal Darrell Adkins of the Greene County Sheriff's Department. On November 16, 2005, he interviewed Kristin Parker after she reported that she had been assaulted by defendant. Officer Shawn Youngblood interviewed her as well. She told the officer that she was helping defendant clean his house and some morphine was missing. Defendant got angry, and according to Ms. Parker, he assaulted her with a knife, a tequila bottle, and his hands, holding her captive in his house for three days. He photographed her injuries, which corroborate the fact of the assault. Officer Youngblood requested consent to search the house. He does not recall whether Ms. Parker declined to give consent. The officer testified that the search warrant for defendant's residence was based on the affidavit, for which he provided information through his

interview with Ms. Parker. He had reviewed the affidavit and stated that the allegations contained therein accurately reflected his conversations with Ms. Parker.

On cross examination, Officer Adkins testified that Ms. Parker did not indicate that she lived at the residence. She indicated that she was there to clean the house. It was the officer's testimony that he did not recall whether Ms. Parker's mental health history had been discussed at all, whether she was on medication, or whether her methamphetamine usage or drug usage was discussed. He thought he had asked her if she was under the influence of methamphetamine, and she said she had been. He agreed that although Ms. Parker claimed she had been held in defendant's custody for multiple days, he was not at the house when the officer arrived. She was not handcuffed or otherwise restrained. The officer did ask Ms. Parker why defendant would have left her by herself after he'd been holding her, and she stated that it was because he had to attend a DFS hearing for his children, which was important. Ms. Parker did request medical treatment and was transported to the hospital, although the officer had no experience determining the age or source of her injuries, which looked like cut marks to him.

On redirect examination, the officer testified that Ms. Parker was trying to get away from defendant's residence, and had gone two houses down to use the phone. When he arrived, she was outside on the steps of that house. Regarding the assault he was investigating, that allegedly took place three days before, but the officer testified that defendant assaulted Ms. Parker multiple times.

Having fully reviewed the record, the testimony, and the exhibits in this case, the Court finds that defendants' Motion to Suppress must be denied.

In terms of the search warrant for defendant's residence, dated September 9, 2005, and the search warrant for his residence, dated November 16, 2005, he asserts that the first search warrant

was invalid because it contained information gleaned from an illegal search conducted under the guise of a protective sweep of his residence; and that the officers forced entry into his home based on information that he was holding several individuals at gunpoint. Regarding the second search warrant, he contends that it was issued without probable cause, and that the information provided by Ms. Parker was stale.

Regardless of defendant's assertions, there is no indication that an illegal search was conducted on September 10, 2005. It is apparent from the testimony adduced at the hearing that officers were responding to a call regarding a domestic assault where the victim was being held against her will at gunpoint. The report also included information that there were other individuals inside, who were being held against their will. The fact that there may have been "No Trespassing" signs or a gate that had to be breeched is of no consequence under the totality of the circumstances of this case. In fact, there was testimony that the officers kicked the door in to enter the house and conduct a protective sweep, given their concern about potential victims. It is apparent that there were exigent circumstances to support the warrantless entry into the residence. Utah v. Stuart, 547 U.S. 398, 402 (2006). There was also credible, undisputed evidence that defendant was shining a high intensity spotlight at the officers and yelling at them. He had to be subdued after a short stand off by the use of a Taser. Once inside the house, while conducting the protective sweep, the officers observed evidence of methamphetamine and its use in plain view, and were given information from a resident of the basement that defendant had a gun hidden down there. With this information, they sought and were issued a search warrant. Regardless of defendant's assertions, it cannot seriously be argued that the entry into the house was illegal, and that the affidavit in support of the search warrant of September 9, 2005 did not support a probable cause finding.

In terms of the search warrant that was issued on November 16, 2005, this warrant was sought after another dispatch call regarding a domestic assault at defendant's residence. On this occasion, the officers found the victim, Ms. Parker, with numerous cuts and bruises, which they concluded to be obvious signs of a recent assault. They transported her to the hospital. She reported that defendant had assaulted her with a knife, a tequila bottle, and a sword; she was able to escape when he left the house to go to a DFS meeting about his children. Again, a search warrant was sought to find evidence of the assault and evidence of methamphetamine, given that Ms. Parker had admitted to the recent use of the drug. The search warrant was clearly supported by probable cause. There is no evidence to support defendant's assertion that the information from Ms. Parker was stale. It should be noted, moreover, that even if the warrant in question was issued without a proper probable cause showing, it is apparent from the testimony that the officers were acting in good faith in reliance on the search warrant issued by a neutral judge, which would obviate any basis for suppressing the evidence. United States v. Leon, 468 U.S. 897, 923 (1984).

Regarding defendant's challenge to the consensual search of his residence on December 22, 2005, law enforcement officers were responding again to a call reporting an assault and kidnaping by defendant against his girlfriend, Kristin Parker. There is nothing in the record to indicate that Ms. Parker did not have the authority to consent to that search. She executed a consent to search form in which she indicated that she was giving consent to a search of her residence. Officer Gibson testified that he had had prior experience with Ms. Parker involving altercations with defendant, which occurred at 3002 North Quail Lane. He knew that she was defendant's girl friend, and he believed that she lived with him. On this occasion, he met with her at that address, which he believed to be their shared residence. Based on the officer's knowledge, it was reasonable for him

to believe that she lived with defendant in December, with the actual or apparent authority to consent to a search of the residence. United States v. Elam, 441 F3d 601, 603 (8th Cir. 2006); United States v. Janis, 387 F.3d 682, 686 (8th Cir. 2004).

Regarding the statements defendant made to Officer Fridley when he was arrested on January 24, 2006, based on the credible testimony adduced at the hearing, there was no evidence to substantiate the allegation that he was so debilitated by a problem with his blood sugar that he could not knowingly waive his Miranda rights and talk to Officer Fridley of his own accord. There is nothing in the record to suggest that his statements were involuntarily made because his insulin levels were high. Further, there was no evidence that defendant's will was overborne. United States v. Brown, 535 F.3d 424, 427 (8th Cir. 1976). Officer Fridley indicated that defendant waived his Miranda rights, that he talked freely, and he was cooperative during the drive from Nevada to Springfield. The officer testified that he did not show any signs of agitation until the booking process began. Even Ms. Glenn could not recall any specific behavior on defendant's part that would suggest he could not act voluntarily. While acknowledging that his blood sugar levels were high, she also reiterated that everyone experiences that situation differently. Therefore, the Court finds that, based on the totality of the circumstances, there is no basis to suppress defendant's statements.

Based on a full review of the record, it must be recommended that defendant's Motion to Suppress evidence and statements be denied.

For the foregoing reasons, it will be

RECOMMENDED that defendant's Motion to Suppress be denied.

/s/ James C. England
JAMES C. ENGLAND, CHIEF
UNITED STATES MAGISTRATE JUDGE

DATE: 9/5/08